IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs December 5, 2017

**STATE OF TENNESSEE v. ANDRE BROWN**

**Appeal from the Criminal Court for Shelby County**
**No. 13-01224        James C. Beasley, Jr., Judge**

————————————————————

**No. W2017-00770-CCA-R3-CD**

————————————————————

The Defendant, Andre Brown, was convicted by a Shelby County Criminal Court jury of two counts of aggravated rape, aggravated kidnapping, and domestic assault and was sentenced by the trial court as a Range I, standard offender to an effective term of thirty years at 100% in the Department of Correction. On appeal, he challenges the sufficiency of the convicting evidence and argues that the trial court erred by enhancing his sentences and ordering consecutive sentencing. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and J. ROSS DYER, JJ., joined.

Stephen C. Bush, District Public Defender; Barry W. Kuhn (on appeal) and Michael Johnson (at trial), Assistant Public Defenders, for the appellant, Andre Brown.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Counsel; Amy P. Weirich, District Attorney General; and Kenya Smith, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

On the afternoon of August 13, 2012, C.B.,[1] a medical assistant student at Delta Technical College, reported to an instructor at her school that the Defendant, a former boyfriend, had kidnapped her from her Southaven, Mississippi, home that morning and taken her to his brother's Memphis home, where he cut her scrub pants off with a box cutter and used a Taser to force her to submit to vaginal intercourse and to perform oral sex on him. The Defendant was subsequently indicted by the Shelby County Grand Jury for aggravated rape by use of force or coercion and while armed with a weapon, aggravated rape causing bodily injury, aggravated kidnapping, and domestic assault.

## State's Proof

At the Defendant's November 2016 trial, the victim testified as follows. In 2012, she was nineteen years old and a medical assistant student at Delta Technical College. She had begun dating the Defendant when she was seventeen and had dated him for approximately a year and half before ending the relationship when she was eighteen. On the morning of August 13, 2012, she exited her Southaven home in preparation for driving to school for her morning classes when she was surprised in the carport by the Defendant, who was carrying a Taser. She attempted to use her cell phone to call the police, but the Defendant wrestled her phone and her mother's SUV keys from her, forced her into the backseat of her mother's SUV, drove her to his brother's apartment complex in Memphis, and yanked her from the vehicle.

The victim did not want to go with the Defendant and wrestled with him, but he forced her into his brother's apartment. Although there were other individuals outside the apartment complex, she did not call out for help because she was "too busy fighting with [the Defendant]." When she entered the apartment, she saw the Defendant's brother, Percy, or "P.J.," and heard some children. The Defendant handed his brother the keys to the victim's vehicle and told him he could use the vehicle to go wherever he wanted. P.J. left, and the Defendant told the victim that he wanted to have sexual intercourse with her. She told him she did not want to, but he picked up a box cutter from beside the television set and began cutting her scrub pants and thermal underwear off her. He also cut her arm, causing it to bleed.

The Defendant wanted the victim to bend over so that he could have intercourse with her, and although she did not want to, she ultimately complied because he kept "tasing" her. After having vaginal intercourse with her, the Defendant wanted her to perform oral sex on him and, once again, repeatedly used his Taser on her to force her to

---

[1] In accordance with the policy of this court, we identify the sexual assault victim by her initials only.

comply. The Defendant ejaculated in her mouth, and she spit the ejaculate out onto the couch. The Defendant began cursing and yelling at her, while she sat there afraid.

The Defendant next gave the victim some pajama pants to wear in place of her destroyed scrub pants. P.J. returned to the apartment and handed the victim's vehicle keys to the Defendant. The Defendant then left the apartment, and P.J. went into a back room. At that point, the victim grabbed her keys, along with the Defendant's identification, from the top of the television where the Defendant had placed them, ran from the apartment, got into her vehicle, which she found parked in front of the apartment, and drove to her school to tell her teacher, "Ms. Lari," what had happened.

The victim explained that she went to the school to tell Ms. Lari because she had had earlier conversations with Ms. Lari about the problems she was experiencing with the Defendant. She said Ms. Lari cleaned the cut on her arm and called the police. The Southaven police officers who responded took her to the Southaven Police Department, where they photographed her wounds. The victim identified the photographs of her injuries, which were published to the jury and admitted as exhibits. She testified that after she talked with the Southaven police officers, she met with a Memphis police officer, who took her to a rape crisis center.

On cross-examination, the victim acknowledged her mother was not happy about her dating the Defendant. She denied that she remained in contact with the Defendant after their break-up or arranged to meet him on the day of the incident. She testified that the Defendant used his Taser on her during their struggle in her carport and picked her up to put her in the backseat of her mother's SUV. She acknowledged that she did not try to escape from the vehicle and that she never called out to bystanders or passing motorists for help. She denied that she saw P.J.'s girlfriend, Kendra, at P.J.'s apartment that day. She said she never saw the children, who remained in a back bedroom at the apartment, and that she never asked P.J. for help.

The victim testified that the Defendant dragged her into the apartment by holding her with one hand and opening the apartment door with his other hand. She did not know where the Defendant's Taser was during that time and said that he either picked up a second Taser, or the same one, from atop the TV once they were inside the apartment. She denied that she told the Defendant in a phone conversation after the incident that she was upset because he was cheating on her or that she could not drop the charges because her mother would "cut [her] off" if she did. Finally, she acknowledged that she filed a claim for victim's compensation and received the maximum allowable amount.

On redirect examination, the victim testified that she did not ask P.J. for help because she knew from past dealings with him that he would do nothing for her. She said

she remained in the apartment until after the Defendant left because she feared for her life while the Defendant was present. She described the pain she felt from the Taser as a nine on a scale from one to ten.

Lari Langley testified that in August 2012 she was an instructor in the medical assisting program at Delta Technical College, where she taught the victim. On the morning of August 13, 2012, the victim uncharacteristically failed to show for class or call to report her absence, which worried her. Sometime between noon and 1:30 p.m. that same day, she saw the victim coming down the hallway toward her. The victim was wearing regular clothes instead of the required scrubs, and the pants she was wearing were missing one leg. In addition, the victim's hair was disheveled, her eyes were bloodshot, and her face was swollen on one side. The victim, who was distraught and had trouble gathering her words, kept repeating, "He did it." Ms. Langley testified she noticed a cut on the victim's arm and called a co-worker over to treat it. Afterwards, the victim told her that she had been raped. At that point, Ms. Langley and her co-worker decided they needed to call the police.

Southaven Police Officer Bryan Rosenberg testified that he responded to the school at 2:22 p.m. on August 13, 2012, where he spoke with and collected a driver's license from the crying victim, who had disheveled hair and a cut on her arm and appeared to be "very upset." He then consulted with his lieutenant, who advised him to bring the victim to the Southaven Police Department to speak with a detective. Afterwards, he escorted the victim to a service station just over the county line, where he waited with her until a Memphis police officer arrived.

Officer Rosenberg testified that he had been tased as part of his weapons training with the Southaven Police Department and that it was "very, very painful" and caused him to become completely incapacitated. He said he had observed a similar reaction from a suspect who, after being tased, "immediately was incapacitated and unable to continue resisting arrest."

Officer Richard Spitler of the Austin, Texas, Police Department testified that he was formerly a patrol officer with the Memphis Police Department and on August 13, 2012, was dispatched to meet the victim and a Southaven police officer at the county line. He said he escorted the victim to the Memphis Rape Crisis Center, remained at the center while the victim was examined, and collected into evidence the victim's pants, which he subsequently checked into the evidence room of the Memphis Police Department.

Amanda Taylor, the sexual assault forensic nurse examiner at the Memphis Rape Crisis Center who examined the victim, testified that the victim gave her the following history: She had been on her way to school at about 9:00 a.m. that morning when the

Defendant took her mother's vehicle and drove her to his brother's house. The Defendant gave her mother's keys to his brother, and his brother left. The Defendant then started cutting her clothes off her with a box cutter and in the process cut her arm and leg. The Defendant made her bend over and he "stroked a couple of times." Ms. Taylor clarified with the victim that the victim was referring to penile-vaginal penetration. The victim continued with her account by reporting that the Defendant appeared dissatisfied with the penile-vaginal intercourse because he next forced her to perform oral sex by repeatedly tasing her left leg. The victim reported that while she was performing oral sex, the Defendant penetrated her vagina with his fingers. She said that the Defendant ejaculated into her mouth, and she spit the ejaculate out. She then asked the Defendant if she could put her clothes back on, and an hour or two later, the Defendant let her go.

Ms. Taylor testified that the victim told her that she had not showered since the assault but had drunk a cold drink. She said the victim was quiet, but tense, during the physical examination. She noted a bruise to the victim's right arm in the joint of her elbow, a small laceration to her right knee, and a deep laceration to her left elbow. She found no genital injuries, which, she said, was not unusual in cases of sexual assault due to the elasticity of vaginal tissue. As part of the rape kit, she collected a saliva standard and oral, vulvar, vaginal, and anal swabs from the victim.

Tennessee Bureau of Investigation ("TBI") Special Agent Forensic Scientist Samantha Spencer, an expert in serology, testified that she found no semen on the vaginal or oral swabs or on the victim's thermal underwear. Various scenarios that could explain the absence of semen included that no sexual contact occurred, the Defendant did not ejaculate, and the victim had engaged in activities such as eating or drinking, which could remove semen from the mouth.

Sergeant Sharon Kelley of the Memphis Police Department's Sex Crimes Unit testified that after taking the victim's statement, she obtained a warrant for the Defendant's arrest on August 24, 2012. On cross-examination, she acknowledged that she and a fellow officer spoke with Kendra Kirkwood and Percy Thompson at the apartment where the rape was alleged to have occurred, but they did not take any photographs or collect any items into evidence.

Officer Gary Adams of the Memphis Police Department testified that, responding to a tip, on September 21, 2012, he located the Defendant hiding under a blanket in a bedroom closet of a residence.

**Defendant's Proof**

Kendra Kirkwood testified that the Defendant was the brother of her common-law husband, Percy Thompson. She said that on August 13, 2012, she and Mr. Thompson lived together with their children in an apartment in the Warren Apartments on Elvis Presley Boulevard in Memphis. She recalled passing the victim and the Defendant on the stairs that morning as she was leaving the apartment to go to work and seeing the victim and the Defendant laughing and talking with each other. As they passed, she spoke to the victim and the victim spoke to her without appearing to be in any distress. She testified that Mr. Thompson drove her to work in their vehicle, leaving their children behind in the apartment to be watched by the Defendant and the victim. She said when she returned home from work that afternoon, the victim was gone. Ms. Kirkwood further testified that she saw the Defendant and the victim together on the day before the alleged incident, as well as on at least twenty-five earlier occasions. Each time the victim appeared to be with the Defendant voluntarily.

On cross-examination, Ms. Kirkwood acknowledged that she had known the Defendant for ten years and considered him family. When asked why she remembered August 13, 2012, so clearly when she had seen the victim at the apartment on so many other occasions, she testified that she had a very good memory. On redirect examination, she agreed that she remembered the day because the police came to talk to her shortly after the alleged incident occurred.

The Defendant's brother, Percy Thompson, testified that the Defendant and the victim pulled up together to his apartment in the victim's truck on the morning of August 13, 2012, as he was about to drive Ms. Kirkwood to work. He said he told them they could not park where they had stopped because they did not have the appropriate parking permit for the apartments. Mr. Thompson stated that the victim gave her keys to him and that she and the Defendant, who were "hugged up" and "lovey-dovey," went into his apartment while he moved the victim's vehicle to a different parking area. He said he returned to the apartment approximately three minutes later, handed the victim's keys to her, and instructed the victim and the Defendant to watch his children while he drove Ms. Kirkwood to work in Ms. Kirkwood's vehicle. He returned to the apartment a few minutes later and stayed with the victim and the Defendant the rest of the day. Mr. Thompson stated he was in the apartment "the whole time" and never saw the Defendant attack or rape the victim. He said the victim left at the end of the day on her own accord and never appeared to be in any distress. Finally, he testified that he had seen the victim with the Defendant as recently as two or three days before August 13, 2012.

On cross-examination, Mr. Thompson testified that he had no memory of telling police officers that he had been outside on the steps while the Defendant and the victim were together in his apartment. He said the victim was in his apartment until 6:00 or 7:00 p.m. that day and did not respond when asked if he could be recalling a different day,

given the impossibility of the victim's having simultaneously been in his apartment and meeting with Southaven police officers at 2:30 p.m.

Keitra Evans testified that the Defendant was a good friend with whom she occasionally had sexual intercourse. She said she did not know the victim but had seen her once or twice, including in June or July of 2012 when she went to Mr. Thompson's apartment complex to pick up the Defendant.

The Defendant testified that he and the victim were still in a romantic relationship on August 13, 2012. He said the victim picked him up from a friend's house at approximately 8:30 that morning and drove them to his brother's apartment, where his brother was leaving to take Ms. Kirkwood to work. The Defendant stated that his brother parked the victim's vehicle for her, returned to the apartment, gave the keys back to the victim, and asked them to watch his children for a few minutes while he drove Ms. Kirkwood to work. When Mr. Thompson returned a few minutes later, the three of them sat together in the apartment smoking marijuana and watching television. The Defendant testified that he and the victim remained at the apartment for a couple of hours until they went together to a service station, where he bought gasoline for the victim's vehicle, and then back to his friend's home, where the victim dropped him off.

The Defendant denied that he attacked or raped the victim and said that they did not have sexual intercourse that day. He claimed he and the victim spoke on the telephone "numerous times" after August 13, 2012, and that the victim told him she could not retract her allegations against him because her mother had threatened to put her out of her home if she did. According to the Defendant, the victim fabricated the rape because she was upset that he was seeing other women.

The State elected to rely on the oral penetration for count one of the indictment and the vaginal penetration for count two. Following deliberations, the jury convicted the Defendant of all counts charged in the indictment. The trial court subsequently sentenced him as a Range I, standard offender to an effective term of thirty years in the Department of Correction.

## ANALYSIS

### I. Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to sustain any of his convictions. In support, he cites the lack of any forensic evidence of sexual intercourse and the testimony of defense witnesses that the victim exhibited no signs of distress and appeared to be in a loving, amicable relationship with the Defendant on August 13, 2012.

The State responds by arguing that the jury, by its verdicts, obviously accredited the State's proof, including the testimony of the victim. We agree with the State.

In our review of this issue, we consider "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 405 S.W.2d 768, 771 (Tenn. 1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)).

"A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The Defendant, essentially, argues that the victim's testimony was not credible and the jury should not have believed it. The jury, however, was entitled to accredit the victim's testimony of the episode and the nature of her relationship with the Defendant over the contradictory testimony of the Defendant and his witnesses. We note that, in addition to the victim's testimony, the jury saw photographs of the victim's injuries and heard testimony from the victim's nursing instructor and the Southaven police officer that

the victim appeared untidy and distraught at the time she reported the kidnapping and rape. The jury also heard explanations from the sexual assault forensic nurse examiner and the TBI agent as to why there might not be physical evidence, such as vaginal injuries or semen, in a rape case. In sum, the evidence was sufficient for a rational jury to find the Defendant guilty of the offenses beyond a reasonable doubt. Accordingly, we affirm the Defendant's convictions.

## II. Excessive Sentence

The Defendant contends that the trial court imposed an excessive sentence by enhancing his sentences and by ordering partial consecutive sentencing. The State argues that the record supports the trial court's sentencing determinations. We, again, agree with the State.

A trial court is to consider the following when determining a defendant's sentence and the appropriate combination of sentencing alternatives:

> (1) The evidence, if any, received at the trial and the sentencing hearing;
>
> (2) The presentence report;
>
> (3) The principles of sentencing and arguments as to sentencing alternatives;
>
> (4) The nature and characteristics of the criminal conduct involved;
>
> (5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;
>
> (6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and
>
> (7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

Id. § 40-35-210(b).

The trial court is granted broad discretion to impose a sentence anywhere within the applicable range, regardless of the presence or absence of enhancement or mitigating

factors, and the sentencing decision of the trial court will be upheld "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." State v. Bise, 380 S.W.3d 682, 709-10 (Tenn. 2012). Accordingly, we review the length of the sentences ordered by the trial court under an abuse of discretion standard, "granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Id. at 707. We, similarly, review the trial court's order of consecutive sentencing for abuse of discretion, with a presumption of reasonableness afforded to the trial court's decision. See State v. Pollard, 432 S.W.3d 851, 860 (Tenn. 2013) (applying same deferential standard announced in Bise, 380 S.W.3d at 682 to the trial court's consecutive sentencing decisions).

At the sentencing hearing, the State introduced the Defendant's presentence report, which reflected that the twenty-four-year-old Defendant, who was twenty at the time of the instant offenses, had four prior misdemeanor convictions: three for criminal trespass and one for aggravated criminal trespass. The presentence report also reflected a substantial juvenile history, including sustained petitions for reckless endangerment, vandalism over $500, evading arrest, and assault. The Defendant reported to the presentence officer that he had no past or present affiliations with a gang, but his file with the Shelby County Sheriff's Department reflected that he was associated with the Vice Lords. The Defendant had no reported history of gainful employment. Neither side presented any witnesses at the hearing, but the Defendant made a brief statement to the court expressing his belief that justice had not been served in his case and asking the court for leniency.

The trial court found as applicable enhancement factors that the Defendant had a previous history of criminal convictions or criminal behavior in addition to those necessary to establish his range and that the Defendant used a deadly weapon, namely, a Taser, during the commission of the offenses. See Tenn. Code Ann. § 40-35-114 (1)(9) (2014). The court considered, but rejected, the Defendant's proposed mitigating factor that he lacked substantial judgment because of his extreme youth at the time of the offenses. See id. § 40-35-113(6). The court, therefore, sentenced the Defendant to twenty-two years at 100% for each of his aggravated rape convictions, eight years at 100% for his aggravated kidnapping conviction, and eleven months, twenty-nine days at 70% for his misdemeanor domestic assault conviction. Relying on the dangerous offender criterion of the consecutive sentencing statute, the trial court ordered that the Defendant serve his aggravated rape sentences concurrently with each other but consecutively to his aggravated kidnapping sentence, for a total effective sentence of thirty years at 100% in the Department of Correction.

The Defendant argues that the trial court's application of the deadly weapon enhancement factor was erroneous because a Taser is a non-deadly weapon. The Defendant does not dispute the application of the prior criminal history enhancement factor and does not address whether his use of a box cutter would satisfy application of the deadly weapon enhancement factor. Given the trial court's broad discretion to set sentences within the applicable range, regardless of the presence or absence of enhancement or mitigating factors, we need not address whether a Taser is a deadly weapon. Accordingly, we affirm the length of the sentences ordered by the trial court.

We also affirm the consecutive sentences ordered by the trial court. A trial court may order multiple sentences to run consecutively if it finds by a preponderance of evidence that one or more of the seven factors listed in Tennessee Code Annotated section 40-35-115(b) applies, including that the defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high. Tenn. Code Ann. § 40-35-115(b)(4). When the court bases consecutive sentencing upon its classification of the defendant as a dangerous offender, it must also find that an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences reasonably relate to the severity of the offense committed. State v. Lane, 3 S.W.3d 456, 460-61 (Tenn. 1999); State v. Wilkerson, 905 S.W.2d 933, 937-38 (Tenn. 1995).

In ordering consecutive sentences, the trial court made the following findings:

In considering other factors with regard to sentences, the Court having reviewed the facts of this case, the Court finds that [the Defendant] is a dangerous offender whose behavior indicates little or no regard for human life, that he had no hesitation about committing a crime in which the risk to human life was high. The Court finds that the circumstances surrounding the commission of this offense are aggravated. Again, the Court finds that [the Defendant] approached the victim in the State of Mississippi at her residence, transported her into Shelby County to a different location, there used a taser on multiple occasions to force her to have both vaginal and oral sex against her will. The Court finds that those facts are aggravated and the Court finds that confinement for an extended period of time is necessary to protect society from [the Defendant's] unwillingness to lead a productive life and the [D]efendant's resort to criminal activity and furtherance of an anti-societal lifestyle. . . . The aggregate length of the sentence reasonably relates to the offense for which the [D]efendant stands convicted.

The Defendant cites the trial court's "protect society from [the Defendant's] unwillingness to lead a productive life and the [D]efendant's resort to criminal activity and furtherance of an anti-societal lifestyle" language to argue that the court failed to make the required finding that consecutive sentences were necessary to protect the public from the Defendant's further criminal acts. We disagree. It is clear from the court's ruling that it found that the Defendant posed a continual danger to the community by his criminal activity and anti-societal lifestyle. We discern no abuse of discretion in the trial court's imposition of consecutive sentences based on the dangerous offender criterion of the statute. Accordingly, we affirm the sentences as imposed by the trial court.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE